UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

GINA L. FRAZIER,               )
                              )
              Plaintiff,       )
                              )      No. 3:07-0818
v.                            )      Judge Echols
                              )
STATE OF TENNESSEE DEPARTMENT  )
OF CORRECTIONS,                )
                              )
              Defendant.       )

## MEMORANDUM

Before the Court for ruling is Defendant's Motion for Summary Judgment (Docket Entry No. 16), to which Gina L. Frazier ("Plaintiff"), responded in opposition (Docket Entry No. 20), and Defendant, State of Tennessee Department of Corrections ("TDOC"), filed a reply (Docket Entry No. 22). Plaintiff brought suit against TDOC, her current employer, asserting claims of a racially hostile work environment and retaliation under Title VII, 42 U.S.C. § 2000e *et seq.*

## I. FACTS

Plaintiff is a Caucasian female who has been employed by TDOC since 1998. Plaintiff served as a correctional officer at the Tennessee Prison for Women until 1999 when she voluntarily transferred to the Turney Center Industrial Prison. In June 2004, Plaintiff voluntarily transferred to Riverbend Maximum Security Institution for a month until she took a leave of absence.

1

Plaintiff was re-employed by TDOC in January 2005 at the Lois M. DeBerry Special Needs Facility ("DeBerry"). TDOC does not produce any evidence that Plaintiff has ever been disciplined. Plaintiff's employment evaluation dated October 2006 to October 2007 rates Plaintiff as "exceptional" in all applicable categories.

In December 2005, Plaintiff took a vacation during which she married Lester Frazier, an African American correctional officer who also works at DeBerry. After Plaintiff returned to work, on December 19, 2005, an African American correctional officer, Gregory Massey, called Plaintiff on the telephone three times and asked her "what I had my boy doing. Did I have my boy picking cotton, did I have my boy picking corn, and did I have my boy slapping (sic) hogs at home." (Docket Entry No. 19-3, Gina Frazier Depo. at 12-13.) Massey asked the same questions during each phone call and laughed. Plaintiff found Massey's comments to be offensive because he characterized her as her husband's master. (Id. at 15.) Plaintiff asked Massey to stop calling her, but he continued to call and she refused to answer the phone. (Id. at 14.) She did not report the incident up the chain of command because she decided to ignore Massey's "ignorance." (Id. at 13, 15.)

2

On March 25, 2006,[1] Plaintiff was assigned to work the yard. Officer Massey and three other African American correctional officers, Vanleer, Blandon and Smith, were also assigned to the yard. Massey twice asked Plaintiff if she wanted to come stand in their circle and Plaintiff ignored him. The third time Massey asked Plaintiff if she was scared. Plaintiff turned around and said, "no, Officer Massey, I don't want any trouble." According to Plaintiff the following then transpired:

> Massey began screaming at me in front of witnesses of his own, cursing me, telling me fuck you, bitch. Fuck you, bitch. I ain't scared of you. And he started back in about what do you have your boy doing in the sally port. Do you have him up there picking weeds? Do you still got your boy picking cotton?
> I asked Officer Massey to stop. . . . he told me that he wasn't scared of me and did not care if I was a female or not. The cussing continued. How many times he said bitch I have no idea. He was screaming and hollering. There was three other officers present, and I started to ignore Massey.
> Massey became very angry, very belligerent, and that's when he told me – he said I have a pistol. I'll shoot you, bitch, and all you mother fuckers, too. And at that time is when Officer Vanleer stepped in and said, Officer Massey, that's enough.

(Id. at 16.) Plaintiff told Massey to "please shut the hell up" and suggested that he get some help, but she refused to be

---

[1]Whether the date is March 24 or March 25, 2006 is unclear as both dates are used in the record. The Court refers to March 25, 2006, as that appears to be the correct date.

3

threatened on State property or anywhere. Plaintiff denied that she told Massey she had a gun, too.[2] (Id. at 17, 43.)

Officer Vanleer reported the incident to Lieutenant Paula Leslie, an African American, who called Plaintiff within 60 to 90 minutes after the incident and stated, "I heard that you had some problems on the yard." (Id. at 17.) Plaintiff replied, "Ma'am, if you've heard then you already know." Lieutenant Leslie stated, "I heard that it's in reference to racial slurs[,]" to which Plaintiff replied, "Yes, ma'am. It's also in reference to a threat on my life." According to Plaintiff, Lieutenant Leslie responded, "You know how Massey is. You have to overlook him. He's obnoxious." (Id. at 17.)

Plaintiff also testified that Steve Nixon, an African American who was then Acting Deputy Warden, and Officer Pearson, a black female, came to her within an hour after the incident with Massey. Nixon said he had already heard about Plaintiff getting married and that it was no secret. Plaintiff said she was not trying to keep it a secret. According to Plaintiff, Nixon told her there were things she had to expect, and she replied, "No, sir, Mr. Nixon. I don't have to expect or accept." Officer Pearson told Nixon in Plaintiff's presence that Plaintiff was a good employee and that was the end of the conversation. (Id. at 19-20.) Plaintiff

---

[2]At least one other version of this event exists in the record, but for purposes of summary judgment, the Court takes the facts as Plaintiff states them.

4

confirmed that if Officer Vanleer had not reported the incident to superiors, she would have reported the incident herself that day to Captain Williams, an African American, who was supervising the shift. (Id. at 18-19.)

According to Plaintiff, on March 27, 2006, Officer Vanleer told her he did not think what happened was right. Corporal McGhee overheard their conversation and McGhee said he would report the incident between Plaintiff and Massey at a regular meeting that day with Nixon and Gil Mathis, an African American who was then Acting Warden at DeBerry. (Id. at 21.)

On March 29, 2006, Plaintiff filed a statement about workplace harassment in the warden's office. Warden Mathis forwarded Plaintiff's complaint, along with statements and other documents pertaining to the complaint, including the TDOC workplace harassment policy, to William B. Hutcherson, Jr., Staff Counsel and Interim EEOO Officer for TDOC, "for review and appropriate action." (Docket Entry No. 20-1, Ex. O.) Also on March 29, 2006, Warden Mathis told Plaintiff that, due to the incident with Massey, she could not work overtime on first shift. Plaintiff usually worked overtime shifts at least six days a month. According to Plaintiff, Warden Mathis did not say that she was precluded from working overtime so that she would not have to deal with Massey. (Id. at 22-23.)

Administrative Lieutenant Gary Tittle, a Caucasian, (id. at 32), was assigned to review Plaintiff's complaint and interview employees. (Docket Entry No. 19-5, Memorandum.) Lieutenant Tittle reported to Warden Mathis on May 18, 2006, that he had spoken to witnesses and reviewed written statements and he found different factual accounts of the March 25, 2006 incident between Plaintiff and Massey. Upon review of all the available facts, Lieutenant Tittle found that an incident did take place on March 25, 2006, which would constitute "inharmonious working conditions," due to horseplay or "picking" by Massey, but Lieutenant Tittle did not feel Massey's behavior was racially motivated. He also reported that the incident between Plaintiff and Massey in December 2005 could not be verified and it was not reported to any supervisors. Lieutenant Tittle also stated that, after Plaintiff complained of racial harassment, Massey was reassigned to Nashville General Hospital to minimize contact with Plaintiff and no further incidents between them had occurred. Lieutenant Tittle recommended that the complaint be referred to the First Shift Commander for appropriate disciplinary action. (Id.) Warden Mathis concurred in the recommendation and referred the matter to Captain Ronald Williams. (Docket Entry No. 20-1, Ex. N.)

The investigation concluded on May 18, 2006, and Massey returned to DeBerry. Plaintiff went on medical leave between May 18 and May 29, 2006 due to stress, anxiety and depression. She

6

was placed on medication for these conditions. Plaintiff tried to return to work on May 30, 2006, but Lieutenant Greenhill would not allow her to return to work because he did not have any paperwork saying she was able to return to work. Plaintiff told him she was able to work and that Captain Brown and Lieutenant Tittle had the paperwork justifying her return to work. (Id. at 25.) Plaintiff apparently worked part of her shift, and the next morning she called Lieutenant Tittle. He promised to look into the situation, but he gave her the rest of the week off. (Id. at 26.) When Plaintiff called Lieutenant Tittle the following week, he told her that her days off would be changed from Friday and Saturday to Tuesday and Wednesday and thereafter she would be transferred to the Tennessee Prison for Women temporarily "for [her] best interest, [her] safety and well being." (Id. at 27.) Plaintiff asked why she was being moved to the Tennessee Prison for Women, and Lieutenant Tittle said, "until all this is over with." Plaintiff asked why she could not be transferred to the Charles Bass Correctional Complex or to Riverbend Maximum Security Institution. Lieutenant Tittle replied that, due to the administrators at DeBerry--Gil Mathis and Steve Nixon--he felt Plaintiff would be better off at the Tennessee Prison for Women. (Id. at 27.) Plaintiff denies that she requested a transfer to the Tennessee Prison for Women.

7

Plaintiff reported for work as a correctional officer at the Tennessee Prison for Women on June 16, 2006, making the same salary she earned while employed at DeBerry. (Id. at 28-29.) Plaintiff believes that she should not have been transferred from DeBerry because TDOC policy provides that the wrongdoer, not the victim, should be transferred. (Id. at 46.) Plaintiff's husband, Lester Frazier, testified that he secretly tape-recorded a conversation he had with Lieutenant Tittle during which Lieutenant Tittle stated that Plaintiff "was done wrong." (Docket Entry No. 20-1, Lester Frazier Depo. at 9.)

Before the transfer from DeBerry, Plaintiff took the examination for promotion to Corporal. After she was transferred to the Tennessee Prison for Women she was promoted to Corporal effective August 1, 2006, and she received a 4.5 percent step raise. (Id. at 29.)

Although Plaintiff believes the work atmosphere at the Tennessee Prison for Women is better than the environment at DeBerry, she would like to have the option to transfer back to DeBerry, where she would be able to work more overtime. (Id. at 32.) At the Tennessee Prison for Women, overtime for security officers is capped at 24 hours or three days per pay period. There is no overtime cap at DeBerry and while at DeBerry Plaintiff worked far more than 24 hours of overtime in a pay period. (Id. at 37.)

8

Plaintiff has not directly asked to be transferred back to DeBerry. (Id. at 33.) Plaintiff produced a copy of an email, however, that Lieutenant Tittle gave to her husband. In the email from Lieutenant Tittle addressed to Gil Mathis and copied to Steve Nixon dated December 21, 2006, six months after Plaintiff's "temporary" transfer from DeBerry, Lieutenant Tittle wrote that Plaintiff called him from the Tennessee Prison for Women "and asked about transferring back to SPND as a Corporal. I told her I would check [with] the both of you. thoughts??" Mathis responded, "NO[.]" (Docket Entry No. 20-1, Ex. L.)

Massey testified that he was never disciplined for the incident with Plaintiff, but he received a phone call several days after the incident informing him that he was being moved off the compound to Nashville General Hospital because he threatened Plaintiff. (Docket Entry No. 19-2, Massey Depo. at 32, 41.) Massey denied that he threatened Plaintiff or that he called her husband a "boy" because, being a black man, use of the term "boy" would belittle himself. (Id. at 34.) Massey met with Warden Mathis and asked why he was transferred from DeBerry. Warden Mathis told Massey to wait and stay at the hospital until Lieutenant Tittle finished his investigation. (Id. at 39-40.)

Massey worked at the hospital two or three months during which time he shuttled inmates between DeBerry and the hospital. Massey then returned to DeBerry at the conclusion of the investigation,

9

around May 18, 2006, and he has been working at DeBerry since.  He works overtime "all the time," normally about 32 hours of overtime in a pay period.  (Id. at 41.)

Massey originally transferred from Riverbend to DeBerry because of personality conflicts at work.  He felt "as though it was the white employees against the black employees."  (Massey Depo. at 22.)  When asked if the black employees were against the white employees at DeBerry, Massey responded, "I'm not going to get into that" and "I just don't know for sure."  (Id. at 23.)

Plaintiff produces evidence that, although Massey testified he has been told by Warden Mathis and other administrators at DeBerry that he is an excellent employee, (id. at 17-18), Massey admits that he has received numerous forms of discipline, including written warnings and suspensions without pay, while employed by TDOC.  These disciplinary actions were taken due to Massey's volatile arguments with inmates and staff, a physical assault on a supervisor, and filthy language directed towards supervisors and co-workers.  (Docket Entry Nos. 20-1.)  Massey has been counseled that if his conduct does not improve, his employment will be terminated.  (Massey Depo. at 65.)  On one occasion, however, it appears that Warden Mathis interceded on Massey's behalf and stopped further processing of a disciplinary charge against Massey for insubordination and refusal to accept a reasonable and proper assignment from a supervisor.  (Id. at 53.)

10

## II.  **STANDARD OF REVIEW**

A party may obtain summary judgment if the evidence establishes there are not any genuine issues of material fact for trial and the moving party is entitled to judgment as a matter of law.  <u>See</u> Fed. R. Civ. P. 56(c); <u>Covington v. Knox County School Sys.</u>, 205 F.3d 912, 914 (6th Cir. 2000).  The moving party bears the initial burden of satisfying the court that the standards of Rule 56 have been met.  <u>See</u> <u>Martin v. Kelley</u>, 803 F.2d 236, 239 n.4 (6th Cir. 1986).  The ultimate question to be addressed is whether there exists any genuine issue of material fact that is disputed.  <u>See</u> <u>Anderson v. Liberty Lobby</u>, 477 U.S. 242, 248 (1986); <u>Covington</u>, 205 F.3d at 914 (citing <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 325 (1986)).  If so, summary judgment is inappropriate.

To defeat a properly supported motion for summary judgment, the nonmoving party must set forth specific facts showing that there is a genuine issue of material fact for trial.  If the party does not so respond, summary judgment will be entered if appropriate.  Fed. R. Civ. P. 56(e).  The nonmoving party's burden of providing specific facts demonstrating that there remains a genuine issue of material fact for trial is triggered once the moving party shows an absence of evidence to support the nonmoving party's case.  <u>Celotex</u>, 477 U.S. at 325.  A genuine issue exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  <u>Anderson</u>, 477 U.S. at 248.  In

11

ruling on a motion for summary judgment, the Court must construe the evidence in the light most favorable to the nonmoving party, drawing all justifiable inferences in its favor. See Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).

### III.  ANALYSIS

TDOC seeks summary judgment on the ground that Plaintiff cannot establish a *prima facie* case of race discrimination under the McDonnell Douglas/Burdine burden-shifting formula. TDOC contends that Plaintiff cannot show that she suffered an adverse employment action or that similarly-situated African Americans were treated better than she was. TDOC does not mention Plaintiff's retaliation claim in its brief or reply brief.

TDOC's formulation of the discrimination issue misconstrues Plaintiff's complaint. As Plaintiff explains in her Memorandum opposing the summary judgment motion, her legal claim is not for disparate treatment based on race, but to recover for what she claims was a racially hostile work environment and for retaliation, which Plaintiff alleges she suffered for having complained about Massey's behavior. The Court will analyze the case as one raising claims for a hostile work environment and retaliation under Title VII.

### A.  Hostile work environment claim

To establish a hostile work environment claim under Title VII, Plaintiff must prove the following elements: (1) she is a member of

12

a protected class; (2) she was subjected to unwelcome harassment; (3) the harassment was based on Plaintiff's protected status; (4) the harassment affected a term, condition, or privilege of employment; and (5) TDOC knew or should have known about the harassing conduct but failed to take corrective action or preventative action. Bailey v. USF Holland, Inc., 526 F.3d 880, 885 (6th Cir. 2008). A hostile work environment exists if the workplace is permeated with racially discriminatory intimidation, ridicule and insult that is sufficiently severe or pervasive to alter the conditions of the Plaintiff's employment, and if an objectively reasonable person would view, and the Plaintiff herself did view, the environment as abusive. See id. at 886; Oncale v. Sundowner Offshore Servs., Inc., 523 U.S. 75, 78, 81 (1998); Harris v. Forklift Sys., Inc., 510 U.S. 17, 21-22 (1993). In determining whether the alleged racial harassment was sufficiently severe or pervasive, the Court must consider the totality of the circumstances. Michael v. Caterpillar Fin. Servs. Corp., 496 F.3d 584, 600 (6th Cir. 2007). The Court must take into account the frequency of the discriminatory conduct; its severity; whether it was physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interfered with the Plaintiff's work performance. Harris, 510 U.S. at 23.

Plaintiff can satisfy the first element of a hostile work environment claim because her interracial marriage to a member of

13

a protected class brings her within the ambit of Title VII. The statute may be violated if an employer takes an adverse action against an employee who is not a member of a protected class if the adverse action occurs because of that employee's association with a person of another race who is in a protected class. Johnson v. University of Cincinnati, 215 F.3d 561, 574 (6th Cir. 2000) (holding plaintiff need not be a member of recognized protected class; plaintiff need only allege that she was discriminated against on basis of association with member of recognized protected class); Tetro v. Elliott Popham Pontiac, Oldsmobile, Buick & GMC Trucks, Inc., 173 F.3d 988, 994-995 (6th Cir. 1999) (holding Title VII applies where employee alleged discrimination because he had a biracial daughter); Holcomb v. Iona College, 521 F.3d 130, 139 (2nd Cir. 2008) (holding Title VII applies where white male employee alleged he was fired at least in part because of his African American wife). Thus, Plaintiff satisfies the first element of her case.

The Court also concludes that Plaintiff has produced sufficient evidence to meet the second and third elements of her hostile work environment claim. For summary judgment purposes, the Court takes as true that Massey, Plaintiff's co-worker, asked Plaintiff several times on December 19, 2005 and again on March 25, 2006, about tasks she had assigned to her "boy." The Court considers the use of the term "boy" in the context of Plaintiff's

14

interracial marriage to Lester Frazier, and in light of Massey's inflection and tone of voice, local custom, and historical usage. See Ash v. Tyson Foods, Inc., 546 U.S. 454, 456 (2006) (setting forth factors to consider when analyzing whether term "boy" indicates racial animus); Bailey, 526 F.3d at 886-887 (discussing widespread and pejorative use of "boy" and "damn it boy" in employment setting over several years as evidence of racial animus).

Massey's comments referenced stereotypical work that was performed by African American slaves for white landowners, such as picking cotton and corn, pulling weeds, and feeding hogs. A reasonable jury easily could find that Massey's use of the term "boy" when asking Plaintiff if she had her African American husband picking cotton or corn, pulling weeds, or feeding hogs indicated his racial animus toward Plaintiff, whom he perceived as Lester Frazier's white "master." Massey's comments were highly offensive to Plaintiff. Thus, for summary judgment purposes, she has shown that she was subjected to unwelcome racial harassment and that the harassment occurred as a result of her race. It is a close question, however, whether Plaintiff can meet the fourth and fifth elements of her claim.

For racial harassment to be actionable, Plaintiff must demonstrate that her workplace was permeated with racially discriminatory intimidation, ridicule and insult that was

15

sufficiently severe or pervasive to alter the conditions of her employment. Plaintiff complains only of the December 2005 and the March 2006 incidents when Massey allegedly made racially disparaging remarks to her.

These two separate incidents, while disturbing to Plaintiff, can hardly be characterized as "pervasive" harassment in Plaintiff's workplace. Cf. Bailey, 526 F.3d at 886 (observing that racially hostile work incidents persisted over six years). The Supreme Court has repeatedly explained that simple teasing, offhand comments, and isolated incidents, unless they are extremely serious, will not amount to discriminatory changes in the terms and conditions of employment. Clark County School Dist. v. Breeden, 532 U.S. 268, 271 (2001).

Although these two events occurred more than three months apart, Plaintiff alleges that Massey became very belligerent and threatened to shoot her during the March 25, 2006 incident. Thus, Massey's alleged conduct involved physically threatening and menacing conduct in addition to offensive utterances. Yet, while Plaintiff contends that Massey's conduct caused her stress, anxiety and depression for which she sought medical treatment, Plaintiff did not testify that her work performance suffered as a result of Massey's conduct toward her. In fact, she testified that, although she languished in a state of depression while she was at home with her family, she continued to report for work and perform her job.

16

Thus, whether these two incidents were "extremely serious" such that they affected a term, condition, or privilege of Plaintiff's employment sufficient to impose Title VII liability on TDOC is a question that should be left for a jury, especially where TDOC failed to address Plaintiff's hostile work environment claim in its motion for summary judgment. The Court declines to grant summary judgment for TDOC on this fourth element *sua sponte*.

Similarly, there are questions about whether Plaintiff can prove the fifth element of her hostile work environment claim by showing that TDOC knew or should have known about the harassing conduct but failed to take corrective or preventative action. Plaintiff admits that she did not report the December 2005 incident with Massey to her superiors. Consequently, a reasonable jury would likely find that TDOC was under no obligation to take corrective or preventative action concerning an event of which it was not even aware.

Plaintiff did not complain to the DeBerry administration about racial harassment until March 29, 2006, four days after the second incident with Massey. Officer Vanleer reported Massey's verbal altercation with Plaintiff to Lieutenant Leslie soon after it happened and thus, TDOC was made aware of the second incident promptly. Plaintiff's own delay in complaining about the incident to DeBerry administration might give a reasonable jury pause to consider whether the incident was as serious as Plaintiff claims,

17

or whether she was more involved in the verbal altercation with Massey than she wanted to admit, or whether she decided to make a complaint of racial harassment only after she sensed that the predominantly African American administration might not be inclined to do anything about Massey's conduct toward her, a Caucasian. <u>See</u> <u>Arendale v. City of Memphis</u>, 519 F.3d 587, 604-605 (6th Cir. 2008) (holding that, in reverse discrimination case, plaintiff must prove background circumstances to support suspicion that defendant is that unusual employer who discriminates against the majority). According to Plaintiff, Deputy Warden Steve Nixon spoke to her about Massey within an hour after the second incident and Nixon told Plaintiff that there were things "she had to expect" as a result of her marriage to an African American man. Plaintiff also alleges that shortly after the incident Lieutenant Leslie essentially advised her to ignore Massey because he was obnoxious. The record contains some indications that Nixon and Leslie dispute Plaintiff's version of these conversations. There is also evidence in the record that, upon receiving Plaintiff's complaint of racial harassment, the DeBerry administration moved Massey to the Nashville General Hospital and conducted an investigation. Whether the results of that investigation, Massey's eventual return to DeBerry without any disciplinary measures taken against him, and Plaintiff's transfer to the Tennessee Prison for Women constitute appropriate corrective or preventative action is a question for the

18

jury. Since TDOC has not properly addressed Plaintiff's hostile work environment claim and asked for summary judgment on this issue, the Court will permit Plaintiff's hostile work environment claim to proceed to a jury trial.

## B. Retaliation claim

To establish a claim of retaliation, Plaintiff must show that: (1) she engaged in activity protected by Title VII; (2) TDOC knew of Plaintiff's exercise of her protected rights; (3) TDOC thereafter took adverse employment action against the Plaintiff; and (4) there was a causal connection between the protected activity and adverse employment action. See Michael, 496 F.3d at 595. A materially adverse employment action is one that "well might have 'dissuaded a reasonable worker from making or supporting a charge of discrimination.'" Burlington Northern and Sante Fe Railway Co. v. White, 548 U.S. 53, 68 (2006) (quoted case omitted).

Plaintiff has produced evidence to satisfy each element of her prima facie case of retaliation. She filed a complaint with her superiors alleging racial harassment in the workplace, which is activity protected by Title VII. TDOC was aware that Plaintiff filed the complaint because TDOC investigated it. The same day the complaint was filed, Plaintiff alleges Warden Mathis prevented her from working overtime on first shift at DeBerry and thereafter TDOC transferred Plaintiff to the Tennessee Prison for Women, a transfer Plaintiff alleges was against her will, while Massey was permitted

19

to return to DeBerry. Plaintiff alleges there was a causal connection between her transfer and her protected activity because the transfer was made less than three months after she filed her complaint, the transfer was a direct result of her complaint, and Lieutenant Tittle informed Plaintiff that her transfer was for her own best interest, safety and well-being.

Having failed to address Plaintiff's retaliation claim in its briefs, TDOC does not specifically identify a legitimate, non-retaliatory reason for transferring Plaintiff to the Tennessee Prison for Women after she complained about racial harassment at DeBerry. See id. at 596. TDOC states only that "Ms. Frazier was transferred to Tennessee Prison for Women where her career has continued to progress with a promotion and raise." (Docket Entry No. 17, Memorandum at 7.) While that statement appears to be true, Plaintiff nonetheless claims that the transfer had an adverse affect upon her employment in that she is deprived of the opportunity to earn all the overtime pay she wishes to earn and could have earned at DeBerry, where an overtime cap is not in place.

Under these circumstances, where TDOC has not put forth a legitimate, non-retaliatory reason for Plaintiff's transfer to the Tennessee Prison for Women, it is unnecessary for the Court to consider whether Plaintiff has presented evidence of pretext. It will be for a jury to determine whether Plaintiff has proved by a

preponderance of the evidence that TDOC retaliated against her for complaining of racial harassment in her workplace at DeBerry.

### IV. CONCLUSION

For all of the reasons stated, Defendant's Motion for Summary Judgment (Docket Entry No. 16) will be denied.

An appropriate Order shall be entered.

ROBERT L. ECHOLS
UNITED STATES DISTRICT JUDGE

Case 3:07-cv-00818   Document 24   Filed 07/14/08   Page 21 of 21 PageID #: 327